Robert M. Haft, J.
Defendant, a practicing dentist in the Chelsea district in Manhattan, is charged with three counts of sexual abuse in the first degree, arising from his alleged sexual touching and fondling of three of his female patients *639 after he had injected certain drugs (sodium secobarbitol and valium) for the purpose of dental extractions. It is the People’s contention that the drugs rendered the patients "physically helpless” and thus incapable of consenting to the sexual contact.
The last of these patients was an undercover policewoman and in conjunction with arranging her appointment with defendant for the extraction of a wisdom tooth, the People applied for and obtained a warrant from a Justice of the Supreme Court to secretly place a camera in defendant’s dental offices to videotape the events of the visit. Defendant’s motion to controvert this warrant and suppress the film obtained from use at the trial presents several novel issues of first impression.[1]
Defendant contends that suppression is required. He claims that the installation of video surveillance equipment and the monitoring and taping of his activities within his office was a search and seizure within the meaning of the Fourth Amendment, and that this search and seizure were unreasonable for the following reasons:
1. There is no statutory authority in this State for the issuance of an order to videotape.
2. The order was improper because the accompanying affidavits are based on unsupported hearsay and therefore fail to establish probable cause.
3. The order was invalid, in any event, because it did not conform to the minimal constitutional standards established for electronic eavesdropping by not specifying: (a) the precise location where the camera was to be installed, (b) the precise activities and area to be observed, (c) the manner in which *640 minimization was to be accomplished and (d) a reasonable limitation during which surveillance was to continue.
4. The order was improvidently granted since normal investigative procedures had not been exhausted before the radical technique of videotaping was employed.
The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.”
The Supreme Court in Katz v United States (389 US 347, 353) held that whether the police have conducted a search within the meaning of the Fourth Amendment does not depend upon a property right in the invaded place, but rather upon whether the area is one in which there is reasonable expectation of freedom from governmental intrusion. Traditionally, a doctor’s office has been so regarded (Mancusi v DeForte, 392 US 364; People v Abruzzi, 52 AD2d 499, affd 42 NY2d 813).
Further, courts have employed the Katz expectation of privacy rationale to provide security from nonjudicially sanctioned visual surveillance of private places and actions (People v Abruzzi, supra).[2]
There is no doubt that the installation of video surveillance equipment and the monitoring of Dr. Teicher’s activities in his office was, indeed, a search and seizure within the scope of the Fourth Amendment. The defendant argues that issuance of the instant warrant was entirely without statutory authority. It is his position that a warrant may issue subject only to a specific statute and that search and seizure by videotape is not provided by either CPL article 690 or article 700 (the New York statutes dealing with the issuance of warrants).
The order and underlying affidavits submitted to the issuing court do not specifically state that this warrant was issued pursuant to article 690 or 700 or both. However, the application for the warrant clearly indicates an effort to comply with *641 the stricter and more particularized formulations of CPL article 700, the eavesdropping statute, as well as to show probable cause for its issuance pursuant to article 690.
CPL 700.15 states as follows:
"An eavesdropping warrant may issue only:
"1. Upon an appropriate application made in conformity with this article; and
"2. Upon probable cause to believe that a particularly described person is committing, has committed, or is about to commit a particular designated offense; and
"3. Upon probable cause to believe that particular communications concerning such offense will be obtained through eavesdropping; and
"4. Upon a showing that normal investigative procedures have been tried and have failed, or reasonably appear to be unlikely to succeed if tried, or to be too dangerous to employ; and
"5. Upon probable cause to believe that the facilities from which, or the place where the communications are to be intercepted, are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.” (Italics added.)
The process of videotaping consists of the simultaneous use of a camera and microphone to convert light energy and sound waves into electronic impulses, which impulses are stored on magnetic tape that can be played back to recreate the audio and visual scene so recorded (Ward, Judicial Administration — Technological Advances — Use of Videotape in the Courtroom and Stationhouse, 20 DePaul L Rev 924). Thus, videotaping does appear to be a device for "mechanically overhearing a conversation” as that term is defined in subdivision 2 of section 250.00 of the Penal Law and used in CPL article 700. It does, however, add a new dimension of visual pickup to the normal means of eavesdropping, which focuses solely on capturing aural evidence. The courts, the Legislature, and commentators agree that title III of the Omnibus Crime Control Act of 1968 (US Code, tit 18, §§ 2510-2520) and its progeny, the State wiretapping statutes, did not encompass videotaping or any means of electronic visual surveillance (see Avery v State, 15 Md App 520, app dsmd 410 US 977, supra; Senate Report No. 1097, 90 Congress, 2d Session [1968 US *642 Code Cong and Admin News, p 2153 et seq.]; Hodges, Electronic Visual Surveillance and the Fourth Amendment: The New Arrival of Big Brother?, 3 Hastings Const L Q 261). Our Legislature in drafting CPL 700.15 seemed not to have considered it.
When, in 1968, most eavesdropping statutes were redrafted to comport with the requirements set forth by the Supreme Court in Katz v United States (supra) and Berger v New York (388 US 41; Senate Report No. 1097, supra; Denzer Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL art 700, p 243), videotaping in industry, government and education was not widespread though it had been in use since 1956.[3] Certainly, warrants for videotaping must comply with the guidelines of Katz and Berger, since videotaping does capture conversations by means of electronic surveillance. Compliance would be accomplished if the statutory requirements of CPL article 700 are met. (See United States v Cirillo, 499 F2d 872, upholding the constitutionality of the CPL eavesdropping provisions.) Consequently, although the warrant ordered here was not explicitly issued pursuant to CPL article 700, it must at least meet the standards imposed by that statute to pass muster.
Since videotaping encompasses two components — visual surveillance and aural surveillance — CPL article 700 which deals exclusively with aural communication cannot alone serve as predicate for issuing a court order to videotape. We must, therefore, examine CPL article 690 to determine if the seizure of visual images is within the ambit of its search warrant provisions.
CPL 690.05 (subd 2), in pertinent part, provides: "A search warrant is a court order and process directing a police officer to conduct a search of designated premises * * * or of a designated person, for the purpose of seizing designated property or kinds of property”.
"Property” subject to seizure is defined in CPL 690.10 (subd 4) to include property which "constitutes evidence or tends to demonstrate that an offense was committed or that a particular person participated in the commission of an offense.” Thus, *643 a visual observation may fall within the scope of property subject to be seized if it constitutes evidence or tends to demonstrate that an offense was committed.
Courts that have had occasion to consider the seizure that results from obtaining visual observations of a crime in progress in a private place, all indicate that the seizure will be legal if it is derived pursuant to a proper warrant issued by a neutral Magistrate (People v Abruzzi, 52 AD2d 499, affd 42 NY2d 813, and other cases cited, supra, p 503, n 2). In Abruzzi, the Appellate Division, Second Department, found that visual observations by police in the course of committing a trespass on a doctor’s property without a warrant, after having received complaints of sexual misconduct from the doctor’s patients, was a search and seizure in violation of the Fourth Amendment. Implicit in this ruling, however, is the fact that a search warrant under CPL article 690 could have issued to permit the police to make observations from a private place.
It thus appears that the issuance of a warrant to obtain both visual and aural surveillance must meet the tests of both CPL articles 690 and 700. However, neither article explicitly contemplates the means employed herein namely videotape— but both read together would seem to encompass this situation. Whether or not CPL articles 690 and 700 explicitly authorized videotaping, the People urge an alternate theory: the inherent power of the Supreme Court to assist in criminal investigations and to issue the necessary judicial process as authority for the promulgation of a warrant to videotape. It is contended that the Legislature in specifying the procedures for the issuance of search warrants and electronic eavesdropping warrants had not sought to limit the court’s inherent power and that nothing precludes the issuance of a court order for videotaping so long as the order conforms to the dictates of the Fourth Amendment.
This court agrees that there is inherent power to issue a videotape order. The Supreme Court in Katz and Berger (supra) permitted electronic eavesdropping pursuant to warrant under certain strict minimal standards. It did not mandate that eavesdropping could only be performed pursuant to statutory authority. Indeed, historically, trial courts throughout the country have exercised their inherent right to issue search warrants. In New York, this power dates back to prerevolutionary days (Hamlin & Baker, Supreme Court of the *644 Judicature of the Province of New York, 1691-1704, pp 68-77). The New York Supreme Court’s jurisdiction and power are coextensive with the authority exercised in 1776 by the Kings Bench and Court of Chancery in England, as well as the Supreme Court of the Colony of New York (Judiciary Law, § 140-b; Matter of Steinway, 159 NY 250, 258). These powers include the right to assist in investigation of criminal activity by issuing search and arrest warrants and those warrants were not issued pursuant to explicit statutory authority (see 1 Hale, History of the Pleas of the Crown, 577-578 [1st Amer ed, 1847]; 2 Hale, id., 114, 149r-150).
Thus, this court holds that CPL articles 690 and 700, read together, authorize the issuance of a warrant to videotape evidence and, in any event, the Supreme Court, in the exercise of its inherent powers, had the authority to issue such a warrant so long as it conformed to the Fourth Amendment requirements of probable cause, particularity, and limitation of scope. The defendant has additionally challenged the videotape warrant on each of those grounds which must now be severally considered.
The application for the warrant consists of affidavits from Detective Inge Macri of the Manhattan Sex Crimes Squad of the New York City Police Department, New York County District Attorney Robert M. Morgenthau and Assistant District Attorney Leslie Snyder. The Macri affidavit outlines the facts underlying the application based upon the statements of three young female patients alleged to be victims of the defendant’s sexual abuse.[4] The other two affidavits refer, in turn, to the Macri affidavit and opine that there are no other investigative procedures which were not tried which might prove successful.
Defendant argues that a finding of probable cause may not be made solely on hearsay allegations unless there is substantial basis for crediting that evidence. He maintains that if the court were to apply the established Aguilar-Spinelli analysis to Detective Maori’s affidavit, it would have to controvert the warrant, because the reliability of the informants and their information were not established.
In Aguilar v Texas (378 US 108) the Supreme Court established a two-pronged test to determine the reliability of hear *645 say allegations. The first prong, the veracity test, is directed at the trustworthiness of the person supplying the information and requires the affiant to set forth reasons which led him to conclude that the informer was credible or that his information was reliable. The second prong, or basis of knowledge test, concerns the trustworthiness of the information and requires that the affiant state the facts and circumstances relied on by the informer in reaching his conclusion. In Spinelli v United States (393 US 410) the Supreme Court supplemented Aguilar by suggesting new methods of satisfying the two-pronged analysis. Thus, the Supreme Court found that as to the first prong — the veracity test — either personal credibility or informational reliability may be satisfied by independent verification of the hearsay. In United States v Ventresca (380 US 102) followed in Spinelli, the court held that the second prong might be satisfied absent a statement recounting the manner in which the information was gathered, by providing so detailed a description of the suspect’s criminal activity as to constitute self-verification. The New York Court of Appeals has taken a parallel tack and permitted additional and similar means of meeting the Aguilar guidelines. (See People v Hanlon, 36 NY2d 549, 557.)
The reliability of the information furnished the affiant is usually established by a statement that the unnamed "informer” has in the past furnished information leading to arrest and conviction of others. (See People v Slaughter, 37 NY2d 596; People v Hendricks, 25 NY2d 129.) But such is not the case here. The three informants are named citizens who claimed to be victims of the crimes alleged against the defendant.
In People v Wheatman (29 NY2d 337, 345, cert den sub nom, Marcus v New York, 409 US 1027) the Court of Appeals indicated that a Magistrate may rely on information where two or more informants tend to confirm the information each gave. In this case, each victim gave a very detailed account of defendant’s abusive actions. Defendant’s pattern of conduct as to each victim was quite similar. Little variation can be found in the accounts. Thus, each victim’s account tended to corroborate the others and served to negate the likelihood that the complainants were suffering from drug-induced delusions or hallucinations or that their information based on first-hand knowledge was unreliable.
Moreover, courts have traditionally viewed named citizen- *646 informants in a different light from undisclosed informers, giving the former much greater credence. (People v Hicks, 38 NY2d 90.)[5] In this case, the detailed version of any one of the victim-informants would have provided sufficient probable cause for defendant’s arrest.[6] The fact that they might be subject to criminal or civil action for false arrest or malicious prosecution would be an additional basis for assuming a lack of fabrication. (Adams v Williams, 407 US 143.)
Furthermore, there was some corroboration of their accounts. The defendant admitted to Detective Macri administering drugs to the first patient although claiming one of the side effects of those drugs could be hallucinations. Following the second patient’s complaint, that complainant was asked to return to defendant’s office wearing a Kel recording and transmitting device which, notwithstanding much interference and inaudibility, did record defendant’s admission that he had kissed her and enjoyed it: "Yes, very much, very very much, very much.” This same patient arranged a "date” at a bar with defendant at the request of the District Attorney, which was recorded but the only significant statement by defendant was that the patient had thrown her arms around him and given him a "fat kiss” and that "it’s not the first time it has happened.” After the third patient’s complaint, a tape device on her phone recorded defendant asking her for a date and expressing a desire to come to her apartment, as no one would know him there, and that he would bring his "bag of goodies” from the office on this "house call”.
For the reasons indicated, the issuing court had ample reason to be satisfied with both the personal credibility of the named informants and the reliability of their information. Thus, the warrant was, indeed, based on probable cause and defendant’s arguments must fail.
Defendant further contends that the application and the resulting order do not state with sufficient particularity the place where the videotape camera was to be installed, what area and conduct were to be observed, and how long such *647 observations were to continue. A warrant must state with particularity the persons or places authorized to be searched and the things to be seized so that an executing officer can reasonably identify them (Steele v United States No. 1, 267 US 498, 503; People v Nieves, 36 NY2d 396). Thus, to protect one’s right of privacy from arbitrary governmental intrusions, nothing should be left to the discretion of the searcher in executing the warrant (Marron v United States, 275 US 192, 196; People v Nieves, supra). This does not mean, however, that hypertechnical accuracy and completeness of description must be attained; rather, the warrant must be viewed from the standpoint of common sense (United States v Ventresca, supra, p 108; People v Hendricks, supra, p 137). The descriptions in the warrant and the accompanying affidavits should be sufficiently definite to enable the searcher to identify the persons, places, or things that the neutral Magistrate has previously determined should be searched or seized (People v Nieves, supra).
The warrant in this case provided for the installation of a videotape recorder in defendant’s offices at 167 Eighth Avenue on the first floor. The affidavit provides that "[t]he camera will remain in a stationary position and will point only towards the dental chair in which the consenting females will be seated” and "[t]he equipment will be turned on only when the consenting females have appointments” with the defendant in order to visually capture defendant’s activities which were expected to be similar to that which had reportedly occurred in the past with three other patients. The instructions for the officers conducting the search appear to be sufficiently particularized and so the warrant may not be struck down on the grounds of a lack of particularity.
Defendant also maintains that the camera was not placed in the first examining room on the left, as stated in the Macri affidavit, but in the second room and, therefore, the resulting search and seizure was invalid. It is clear that the order and affidavit required the visual surveillance equipment to be installed at 167 Eighth Avenue on the first floor, where defendant had his offices, where he engaged in the practice of dentistry, and where his patients received treatment. This is precisely what was done. If, indeed, the videotaping occurred in the "second” instead of the "first” room, there is no dispute that the defendant did treat the undercover policewoman in the room in which the videotaping occurred. The reference to *648 the "first” examining room in the warrant is no more than a mere technical error. Technical errors in a portion of the description of the premises to be searched will not invalidate a warrant if the premises can be identified with reasonable effort and there is no reasonable probability that a search may be made of premises other than those intended to be searched under the warrant. (People v Sprague, 47 AD2d 510; People v Galleges, 80 Misc 2d 265; People v Mongno, 67 Misc 2d 815.)
Defendant’s argument that the specific acts which the videotape equipment intended to capture on film are not delineated with sufficient particularity is specious. The affidavit sets forth in minute detail the acts allegedly perpetrated against the first three complaining patients and seeks evidence of similar acts that may be committed against undercover police agents or other patients co-operating with the authorities. Such a description is sufficient. The prosecution does not have to attempt to read the mind of the defendant and state explicitly each and every act it believes he will commit. It is enough to couple the evidence sought — namely, defendant’s actions to be recorded — to the specific type of criminal behavior he is alleged to have committed in the past.
Defendant additionally urges that the warrant fails to provide adequately for minimization; in particular, he points to the last paragraph of the order which states that "the order shall not automatically terminate when a photographic record of the activities described herein has first been obtained but in no event shall it exceed 30 days”. Defendant claims that CPL 700.30 (subd 7) mandates that a warrant must terminate upon attainment of its objective; otherwise it is overly broad and invalid. However, this warrant calls for minimization in the prior paragraph, and the affidavit indicates that monitoring would occur only when consenting females were patients. Furthermore, it is quite apparent from the use of the plural "consenting females” that the District Attorney was contemplating the use of more that one undercover or co-operative patient within the 30-day period and had not made any decision as to the number. Thus, even if he were successful in obtaining evidence as to one patient, he desired the option of pursuing the matter on the ground that the defendant’s conduct was a repeated ongoing crime.[7] The continuing repeti *649 tious crime theory has been accepted in various gambling cases (see People v Gnozzo, 31 NY2d 134). This court finds that the warrant provided for adequate minimization and only limited intrusion.
Lastly, defendant argues that the extraordinary use of videotape was unwarranted because other investigative tools were available to the government in its pursuit of this investigation. This court disagrees. The use of consensual aural recording had proved to be of minimal assistance. The use of an undercover agent alone, suggested as an alternative by defendant, could yield little in the way of additional evidence, particularly during the period when the agent was expected to be rendered unconscious or semiconscious. The principal reason for the use of the videotape was to obtain information during the period when the drugs had taken their full effect since none of the earlier victims were able to relate what sexual activities had taken place before their return to consciousness. Such activity could take place in complete silence, and the expected high level of extraneous background noise in a dentist’s office rendered an electronic eavesdropping device useless. Further, the personal safety and dignity of any female police agent would be jeopardized if a backup team were not able to monitor the transaction and put a stop to it before any sexual act was culminated.
Accordingly, the defendant’s motion to controvert the warrant and suppress the videotape is in all respects denied.

. A survey of other jurisdictions reveals that many courts have considered the introduction of videotape evidence, but none have done so in the context of evidence acquired by court order of transactions in a person’s private office. (See, e.g., State v Hewett, 86 Wn 2d 487, videotaping of a deposition; Hendricks v Swenson, 456 F2d 503; and State v Lusk, 452 SW2d 219 [Mo], videotaping of confessions; People v Heading, 39 Mich App 126, videotaping of a lineup; Mikus v United States, 433 F2d 719, videotaping of a bank robbery; Avery v State, 15 Md App 520, app dsmd 410 US 977), videotaping in private home with consent of the owner of defendant engaging in assault.) Other than the use of videotaping trials (e.g., Viedotape Trials: A Practical Evaluation and A Legal Analysis, 26 Stan L Rev 619, few articles deal with videotaping as a method of obtaining evidence; see Admissibility of Videotape Film in Evidence in Criminal Trial, 60 ALR3d 333; Ward, Judicial Administration — Technological Advances — Use of Videotape in the Courtroom and the Stationhouse, 20 DePaul L Rev 924; Hodges, Electronic Visual Surveillance and the Fourth Amendment: The Arrival of Big Brother?, 3 Hast Const LQ 261 [1976]).

. See People v Terrell (53 Misc 2d 32, affd 30 AD2d 644); People v Diaz (85 Misc 2d 41); Jacobs v Superior Court of Stanislaus County (36 Cal App 3d 489); State v Person (34 Ohio 97); State v Di Bartolo, (276 So 2d 291 [La]); cf. cases predating Katz, decided on the same basis, People v Hurst (325 F3d 891) and Brock v United States (223 F2d 681).

. Videotaping was invented by Ampex Corp. of Redwood City, California, in 1956. It received widespread acceptance in the business community starting in 1963 with the advent of smaller portable models of closed circuit systems. (See Ward, Judicial Administration — Technological Advances — Use of Videotape in the Courtroom and The Stationhouse, 20 DePaul L Rev 924, supra.)

. Two of these three patients testified before the Grand Jury, reaffirming their statements to Detective Macri.

. Also see State v Kurland (130 NJ Super 110); People v Hill (13 Cal 3d 731); State v Watkins, 228 NW2d 635 [SD]; State v O’Bryan (96 Idaho 548); State v Bluain (315 So 2d 749 [La]); State v Drake (224 NY2d 476 [Iowa]); State v Jones (110 Ariz 546); Guzewicz v Commonwealth of Virginia (212 Va 730).

. The People claim that fairness dictated that defendant, a professional man, with no prior criminal record, who had denied the allegations made against him, should not have been summarily arrested without the additional corroboration which the videotape was intended to provide.

. Of course, since the defendant was actually arrested at the time of the videotaping of his encounter with the first undercover policewoman, further visual surveillance within the 30-day period became academic.