**UNITED STATES of America, Plaintiff,**

**v.**

**Alejandrina TORRES, et al., Defendants.**

**No. 83 CR 494, 1–4.**

United States District Court,
N.D. Illinois, E.D.

Jan. 16, 1984.

Daniel K. Webb, U.S. Atty., Joseph H. Hartzler, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Michael E. Deutsch, Dennis Cunningham, Melinda Power, David C. Thomas, Chicago, Ill., for defendants.

### Memorandum

LEIGHTON, District Judge.

In this superseding eight-count indictment, Alejandrina Torres, Edwin Cortes, Alberto Rodriguez, and Jose Rodriguez, are charged with seditious conspiracy and related offenses against the United States. They move to suppress evidence which government agents obtained as a result of electronic surveillances purportedly authorized by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520.

The parties have been heard; they have filed written submissions; and oral summations have been made by their counsel. Orally from the bench, the court made its findings of fact, reached conclusions of law, and entered an order which, in part, sustained the motion to suppress. This memorandum summarizes the procedural background of this case, including the motions to suppress, and makes more explicit and definite the court's oral findings and conclusions.

### I

#### A. *The Procedural Background*

Defendants were all arrested on the same day, June 29, 1983, in the City of Chicago; and thereafter, at a preliminary hearing before a magistrate of this court, bail was set for Alejandrina Torres at $5 million cash and for each of the other defendants, cash bail of $10 million. On July 6, 1983 a one-count indictment was returned, charging that between June 14, 1975 and June 29, 1983, the exact dates being unknown to the Grand Jury, defendants and one William Morales wilfully and knowingly became members of and participants in a conspiracy formed by a clandestine group "known as the Fuerzas Armadas de Liberacion Nacional Puertorriquena (Armed Forces of Puerto Rican National Liberation) or FALN."

The indictment alleged that between June 14, 1975 and November 25, 1979, as a part of the conspiracy, "the conspirators would seek to achieve their goals and thereby oppose ... the authority of the government of the United States by means of force, terror and violence, including the construction and planting of explosive and incendiary devices at banks, stores, office buildings and government buildings,..."

located in the metropolitan area of the City of Chicago.

Each defendant was arraigned; this Court set a schedule for the pretrial conference and the filing of pretrial motions under local criminal rules. On July 29, 1983, Jose Rodriguez moved for reduction of his bond; and in answering his allegations, the government made a written submission in which it disclosed that in the course of its investigations of defendants and this case, applications for, and renewals of, authorizations had been made to the Chief Judge of this court for orders which permitted the interception of wire and oral communications at two locations in the City of Chicago: Apartment 505, 736 West Buena and Apartment 211, 1135 West Lunt.

It was also revealed that authorizations, both originals and renewals, were obtained which enabled special agents of the Federal Bureau of Investigation to install devices that could visually monitor and record all activities that took place in the two apartments, where, during the period in question, defendants or some of them, enjoyed an expectation of privacy. All of the orders were issued pursuant to the purported authority of Sections 2518(4)(c) of Title III of the Omnibus Crime and Safe Streets Act of 1968, 18 U.S.C. Sections 2510–2520.

After learning of these aural and visual interceptions, but in accordance with a previously set schedule, defendants Torres, Cortes, and Alberto Rodriguez filed a 99-page motion to dismiss the indictment, supported by appendices totaling 65 pages in which they reviewed the history of the relation between the United States and Puerto Rico during the period between 1898 and 1974. This review covered what defendants described as the struggle for independence of Puerto Rico. They argued that they are not domestic criminal accuseds to be prosecuted in this case; they are prisoners of war to whom this court should afford P.O.W. status.

But if this court did not agree, defendants contended that their case should be transferred to a competent international tribunal. Or in the alternative, they argued that this court should compel the government to produce all records and logs of FBI surveillance, investigations, and counterintelligence concerning them and groups of Puerto Ricans who had struggled for the independence of their native island. Defendants requested the court to grant them a hearing, if their motion to dismiss were not granted, "and order the suppression of all illegally obtained evidence." [1]

The remaining defendant, Jose Rodriguez, proceeding on a schedule for himself, filed a motion requesting that this court hear evidence and "suppress electronic surveillance." He alleged he was relying on the ground that authorizations for interception of wire and oral communications in the two apartments were issued without the probable cause required by 18 U.S.C. §§ 2518(3)(a), (b), (d) and by the Fourth Amendment to the Constitution of the United States; that the initial applications and the renewals were not in compliance with the specific requirements of 18 U.S.C., §§ 2518(1)(c) and 4(c). Further, he alleged that the applications and their subsequent renewals were based on allegations which were false at the time they were presented to the Chief Judge and that those making the original and renewal applications knew of the falsity and acted with reckless disregard of the truth.

He further alleged that the surveillances conducted by agents of the government in the two apartments, pursuant to the authorizations, both original and renewals, violated the orders issued by the Chief Judge, and contravened constitutional prohibitions against general searches. For these reasons, he asked this court to enter an order suppressing all electronic surveillance intercepted by agents of the government in this case. Earlier, the court had

---

1. The petition to dismiss was denied; and the court's reasons were stated from the Bench, an order was entered, accordingly.

ordered that in this multi-defendant prosecution, a motion filed by one defendant would inure to the benefit of all defendants unless a defendant particularly disclaimed the advantage of that motion. A date was set for hearing of both that portion of the motion by Torres, Cortes, and Alberto Rodriguez for suppression of evidence, and the motion of Jose Rodriguez to suppress electronic surveillance. This setting was with the understanding that defendants' motions would be heard first, and depending on the court's ruling or rulings, the case would proceed to trial.

Accordingly, on Monday, January 9, 1984, the cause was before the court; the motions were called for hearing. Counsel for the parties made opening statements that delineated the scope of the motions to suppress and the items of evidence which defendants were contending had to be excluded from use by the government. Their counsel stated that they were seeking to suppress not only the wire and oral communications which government agents had intercepted in the two apartments, but were also raising legal questions that challenged the right of the government to procure court orders that authorized its agents to install devices by which they could visually monitor and record all activities that took place in the apartments. Defendants' lawyers asserted that Section 2510(4) of the Omnibus Crime Act defines "intercept" as "the aural acquisition of the contents of any wire or oral communication," a term which many courts have construed to mean coming into possession through the sense of hearing as distinguished from the sense of sight, the principal characteristic of visual monitoring. Thus, with the objectives of defendants' motions to suppress delineated, the court heard the parties; and from the evidence makes the following findings.

B. *The Facts*

On January 18, 1983, an assistant United States attorney for this district applied to the Chief Judge of this court for an order pursuant to § 2518 of Title 18, United States Code, authorizing the Federal Bureau of Investigation of the Department of Justice to intercept wire and oral communications from a telephone (312) 528-9075 subscribed to by Luis Berrios in Apartment 505, 736 West Buena, Chicago, Illinois. The application was under oath and stated there was probable cause to believe that the apartment had been and will be used by Edwin Cortes, Alejandrina Torres, and others yet unknown in connection with the commission of certain offenses, particularly conspiracy to oppose by force the government of the United States, in violation of 18 U.S.C. § 2384.

According to the application, the facts which supported the belief of probable cause were contained in a 67-page affidavit of a special agent of the Federal Bureau of Investigation to which were appended 11 multi-paged exhibits. As authority for the application, the assistant United States attorney referred to terms defined in § 2510 of Title 18, United States Code, and requested that additionally, the Chief Judge include in the "[o]rder the authorization for special agents of the Federal Bureau of Investigation to install in Apartment 505, 736 West Buena, Chicago, Illinois, devices that will visually monitor and record the activity taking place in furtherance of the above-described purposes." It was further requested of the Chief Judge "that Special Agents of the Federal Bureau of Investigation be authorized to surreptitiously enter the [apartment in question], ... and at night if necessary, ... for the purpose of installing, concealing, adjusting and ... removing oral interception and visual observation devices" utilized pursuant to the order.

The supporting affidavit to the exhibits described the experiences of the special agent as an investigative officer of the United States, particularly his investigations of crimes of violence in New York City, other locations, and in the Chicago metropolitan area, between 1975 and 1980. Affiant stated that he investigated the criminal activities of a terrorist group which calls itself the Fuerzas Armadas Liberacion Nacional Puertorriquena (translated as armed forces of Puerto Rican nation-

al liberation) or FALN. He said he had personally participated with, and had knowledge of activities of other FBI investigators, those of the United States Secret Service, the Chicago Police Department, and the Illinois Department of Law Enforcement, Division of Criminal Investigation, in connection with the FALN, details of which he described in his affidavit. Based on information he had acquired from such sources, the agent said there was probable cause to believe that "Edwin Cortes, Alejandrina Torres, and others as yet unknown," had committed and were then committing offenses involving conspiracy to oppose by force the government of the United States, in violation of Title 18, United States Code § 2384. He stated there was probable cause to believe that Apartment 505, 736 West Buena, Chicago, Illinois, had been and would, in the future, be used by Edwin Cortes and Alejandrina Torres, and others as yet unknown, in connection with commission of offenses against the United States.

The agent then from personal knowledge, and other sources, described what he said was an overview of the FALN; it was a clandestine organization composed of individuals who have dedicated themselves to "liberating Puerto Rico from United States control." Based on what he knew personally, and from results of FBI investigations, the agent averred that "[t]he FALN is responsible for over 130 bombing and incendiary attacks, armed takeovers and a series of armed robberies," incidents that spanned the period of October 26, 1974, when the group claimed credit for five bombings in downtown New York City, and the end of 1982.

The event which gave affiant and other agents of the FBI important information concerning this clandestine organization was the April 4, 1980 arrest in Evanston, Illinois of 11 FALN members who had assembled for the purpose of robbing an armored truck making a pick-up at Northwestern University. This arrest led to the conviction and life imprisonment of one of the 11 in New York, conviction of the remaining 10 in Illinois state court for armed violence and weapons offenses, and the conviction of those 10 in a prosecution in this court, 80 CR 736, for which they were sentenced on February 18, 1980 to terms of incarceration ranging from 55 to 90 years.

One of these individuals, Freddie Mendez, later agreed to cooperate with the government, and subsequently provided what the agent said was a wealth of reliable information concerning the FALN, including details of the behavior of FALN members, and their mode of operation. With this information, affiant and other agents learned of the plans, purposes and objectives of the organization, together with the identity of certain individuals involved.

Mendez told affiant about the operation by the FALN of what its members called "safe houses," premises in which apartments were rented under assumed names and in which bombings, robberies, and armed takeovers were discussed and planned; places where bombs and incendiary devices were manufactured and people trained for these activities. Mendez, in his various debriefings, told agents of the government about the details of training and indoctrination of members of the organization; he gave federal agents details about FALN activities in several "safe houses". The Evanston arrest of the 11 FALN members directly led to the discovery of five "safe houses" and one garage in 3 states: Illinois, Wisconsin, and New Jersey.

The affiant swore that Mendez also gave him, and other FBI agents, information concerning Edwin Cortes and Alejandrina Torres. Cortes had been identified by FBI investigation as being an associate of three other FALN members; Mendez had informed FBI agents that Cortes told him personally he wanted to join the FALN and frequently discussed terrorist actions. Mendez knew Cortes to own and often carry a revolver; he believed Cortes to be a likely candidate for FALN recruitment, if he was not already a member.

As to Alejandrina Torres, Mendez told affiant that she was the stepmother of an

incarcerated FALN member, Carlos Torres, with whom she had repeated contacts while he was an inmate in an Illinois penitentiary. Her primary function, according to Mendez, was to serve as a link between him, when he was in prison, and FALN members who were active outside prison walls. Mendez told FBI agents of conversations he had with Alejandrina Torres concerning FALN plans to procure the release of incarcerated FALN members. Mendez, in various conversations told affiant that Torres was familiar with FALN jail breakout plans and she was knowledgeable in the various code words known only to members of the FALN. Her knowledge of these code names was extensive and included code words that were used to refer to well-known FALN members, those incarcerated, and some who were at liberty. Mendez said that in various visits with Torres, he saw her handle papers by grasping them between the sides of her index and middle fingers, a method of holding papers he was taught by an FALN leader as the way to avoid putting fingerprints on documents.

Concerning the apartment at 736 West Buena Street in Chicago, the special agent stated that on September 1, 1981, it was rented to a person identifying himself as Luis Berrios; and on August 16, 1982, the lease was renewed for one year. Investigation revealed there was no person by the name of Louis Berrios listed at that address as a registered voter; no Illinois auto license was known to exist in that name; nor was there any motor vehicle registered in Illinois to that name at that address.

According to the agent, rent for the apartment was paid by money orders purchased from a currency exchange. Investigation by FBI agents disclosed that the money orders were purchased by the defendant Edwin Cortes, a fact established by a photograph taken of him at the currency exchange. Throughout the time in question, Cortes lived with his wife and children at 5147 South Paulina in Chicago; the Buena Street address is 4200 North in the City of Chicago. During the same period of time, defendant Alejandrina Torres lived at 1305 North Hamlin with her husband and children, on a street located 3800 West in Chicago.

Beginning with the period December 7 through 20, 1981, the special agent said that members of the Chicago Terrorist Task Force began what he described were "intense physical surveillances" of Edwin Cortes. This involved his being followed by agents of the government from his place of employment at 5060 South State Street, Chicago, to the central and northern parts of the city. He was seen using public transportation and engaging in furtive conduct which the special agent said was characteristic of FALN members when they engaged in clandestine activities. These surveillances culminated in Cortes being seen entering the apartment at 736 West Buena Street on a number of occasions during the period September 7, 1982 through January 8, 1983.

During that same time, Alejandrina Torres was observed entering the Buena Street apartment. She was seen driving a Ford Pinto registered in her name, and from her home address. Pen register records for the telephone 528-9075 in the apartment were monitored; they disclosed a pattern of use which furnished the basis for agents of the government to believe that the telephone was used by Torres and Cortes for clandestine purposes. The manner of dress and clothing of both Cortes and Torres were observed by FBI agents and, their conduct conformed to the information furnished by Freddie Mendez concerning the behavior of FALN members.

The special agent's affidavit went on to state that the subjects of his investigation took great care to ensure that their criminal activities remain shielded from law enforcement scrutiny; these individuals did not confide in anyone, they used disguises, and false identities, and took great pains to prevent law authorities from gaining possession of useful physical evidence of their crimes. He said that the use of search warrants, pen registers, were ineffective.

Mendez, said the agent, had advised government investigators that FALN members routinely studied photographs of agents, police officers, and of prosecutors in order to know their enemies; they were heavily armed and weapons trained. The agent said "[a]ccordingly, normal investigative procedures have been tried and have failed, all reasonably appear to be unlikely to succeed if tried or to be too dangerous." He then reviewed the necessity of telephone company assistance, and the need for authorized surreptitious entry into the apartment; and he assured the Chief Judge that the electronic surveillance would be conducted in such a way as to minimize the interceptions. He swore to the belief that the activity to be electronically covered was continually criminal and conspiratorial; that the evidence sought will be obtained on a continuing basis, following the first interception; and "shall continue until communications are intercepted which reveal the manner in which Edwin Cortes, Alejandrina Torres, and others as yet unknown, participate directly or indirectly in the criminal conduct described...." The Chief Judge issued the order as applied for, including the authority for visual monitoring and recording of the activity taking place in Apartment 505, 736 West Buena Street, Chicago, Illinois.

Thereafter, four applications were made to renew the order, the last one on May 18, 1983. Each renewal application was under oath and supported by the affidavit of an FBI agent to which were appended exhibits. Each supporting affidavit referred to the government's prior request for court authority to conduct the interception of wire and oral communications in the apartment; and each detailed the acts of Alejandrina Torres and Edwin Cortes in the apartment, including telephone calls they made and received there. Some of the applications appended transcripts of telephone conversations which disclosed plans Torres and Cortes were discussing about forcing the release from incarceration of an FALN member who was then in an Illinois penitentiary, and one who was in federal custody in the Leavenworth Penitentiary in Kan-

sas. The affidavits described how Torres and Cortes were actually engaged in assembling explosives in the Buena apartment; and one exhibit, consisting of a photograph taken by the visual monitor camera in the apartment, showed Torres and Cortes in the process of assembling explosives.

One supporting affidavit stated that agents had made a surreptitious entry into the apartment and saw items of explosives which they inventoried, inspected, but left untouched. In two instances, affidavits described how information that had been obtained from electronic surveillance of the apartment enabled the government to prevent the forcible release from prison of two FALN members. In response to each renewal application, the Chief Judge entered the orders requested and authorized continued interception of wire and oral communication in the Buena apartment; he also authorized continued installation of visual monitoring and recording devices.

On April 5, 1983, another sworn application was made to the Chief Judge for authority "to intercept oral communications of Edwin Cortes, Alejandrina Torres, and others yet unknown" in Apartment 211, 1135 Lunt Avenue, Chicago. An Assistant United States Attorney said the apartment had been and would be used "by Edwin Cortes, Alejandrina Torres, and others as yet unknown" in connection with the commission of certain criminal offenses, among them, opposing by force the government of the United States in violation of Title 18, United States Code, § 2384. The reason for seeking authority to intercept only "oral," rather than the "wire and oral" communications of the named individuals in the apartment, was the absence of a telephone in those premises.

The application, as did the one for the Buena Street address, asked that special agents of the Federal Bureau of Investigation be authorized to install in the Lunt Avenue apartment "devices that will visually monitor and record the activity taking place in furtherance of the above-described purposes." It was supported by an FBI agent's affidavit to which was appended nine exhibits, five of them photographs

that detailed what government agents had observed through surveillance of Cortes and Torres in and around the Buena Street and Lunt Avenue apartments. The special agent told the Chief Judge that the "oral communications" to be intercepted "will concern the construction and placing of explosive devices, the criminal activities of the members of a violent terrorist group calling itself the FALN, the planning of armed robberies (affecting commerce) to finance this group's criminal activities, the conspiracy to oppose by force the authority of the government of the United States, the precise nature and scope of the illegal activities, and the identity of co-conspirators involved in the commission of these offenses."

Affiant then went on to describe conversations that had been intercepted at the Buena Street apartment, and the relation they seemed to bear on the criminal activities of the FALN. Although the Lunt Avenue apartment had been rented by a man identifying himself as John Bell, FBI investigation revealed there was no verifiable evidence that such an individual existed: he was not registered as a voter in the City of Chicago; records of the Illinois Secretary of State did not show issuance of a license or registration of an automobile in that name or at that address; Illinois Bell Telephone records did not show a telephone assigned to John Bell at 1135 Lunt Avenue, Chicago. Surveillance of Alejandrina Torres on March 31, 1983, led agents of the Federal Bureau of Investigation to evidence which reasonably indicated that she was paying the rent for the apartment.

Acting on the application thus supported, the Chief Judge issued the order authorizing interception of "oral communications" in the Lunt Avenue apartment, including a provision which allowed agents of the government to install devices that could visually monitor and record the activities taking place in those premises. This order was renewed twice thereafter, the last time on June 3, 1983; each renewal application was supported by an affidavit to which were appended exhibits. In each instance, the renewal application was granted and a renewed order was issued.

In none of the applications, nor in any of the supporting affidavits, is there any claim by any government agent that Alberto Rodriguez or Jose Rodriguez were ever seen in or near the Buena Street apartment. These two defendants do not claim any possessory or proprietary interest in those premises; they never arranged for their use, or ever had anything to do with acquiring the right to any of the facilities they contained. The government does not contend otherwise.

As to the Lunt Avenue Address, these two defendants do not claim, nor does the government assert, that they had or have any proprietary or possessory interest in the apartment there. However, on one occasion, April 17, 1983, an oral conversation between Alberto and Jose Rodriguez was intercepted in the apartment. On three occasions, April 10, 19, and 24, 1983, in that apartment, oral conversations between Alberto Rodriguez and Edwin Cortes were intercepted by government agents. In fact, none of the six affidavits filed in support of the two original and four renewal applications mention the names of Alberto and Jose Rodriguez.

The electronic surveillances of the two apartments continued from January 18, 1983, when the original Buena Street court authorization was obtained, to June 29, 1983, when defendants were arrested. Between these two points of time, without limitation as to time of day or mode as to their use, the government maintained devices that enabled its agents "to visually monitor and record the activity taking place in" the two apartments. As a result of the visual surveillance, approximately 130 hours of video tapes contained in 52 separate reels were obtained by the government which recorded the activities of defendants, or some of them, within the privacy of the apartments.

## II

### A. The Issues

From these facts, the contentions and arguments of the parties present the following issues.

1. Whether, and if so to what extent, Alberto Rodriguez and Jose Rodriguez have standing to challenge the legality and the constitutionality ·of the electronic surveillance conducted by agents of the government in either the Buena Street or the Lunt Avenue apartments.[2]

2. Whether the affidavits filed by the government in support of the original and renewed applications for orders that authorized electronic surveillance in the Buena Street and Lunt Avenue apartments complied with the requirements of 18 U.S.C. § 2518(1)(c), established the probable cause which the Chief Judge had to determine under 18 U.S.C. §§ 2518(3)(a), (b), (d), and met the requirements of the Fourth Amendment to the United States Constitution.

3. Whether defendants made the required substantial preliminary showing that false statements, necessary to the finding of probable cause, were knowingly, intentionally, or with reckless disregard for the truth, included by affiants in their affidavits, thus entitling them to a hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–2677, 57 L.Ed.2d 667 (1978).

4. Whether Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, authorizes a federal judge to enter orders permitting agents of the government to visually monitor and through video electronic devices record activities taking place in apartments in which defendants, or some of them, enjoyed an expectation of privacy.

B. *The Law*

1. As to the issue of standing.

■ In essence, standing involves the question whether a litigant is entitled to have the court decide the merits of the dispute, or of particular issues. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). Article III of the federal Constitution requires the party who invokes a court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct ...," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Valley Forge, etc. v. Americans United, etc.*, 454 U.S. 464, 465, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

■ In a case like this one, the Constitution and Section 2518(10) of Title 18 permit only an "aggrieved person" to move for suppression of evidence. *Alderman v. United States*, 394 U.S. 165, 171, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969); *United States v. Dorfman*, 542 F.Supp. 345, 359 n. 6 (N.D.Ill.1982). For this reason, it is generally held that a defendant, seeking to suppress evidence procured through interception of wire and oral communication, must be a party to the communications which the government seeks to use at trial, or that the conversations took place on his premises. *Alderman v. United States, supra* at 171, 89 S.Ct. at 965; *United States v. King*, 478 F.2d 494, 506 (9th Cir.1973); *United States v. Ceraso*, 355 F.Supp. 126, 127 (M.D.Pa.1973).

■ However, as to the Buena Street apartment, neither Alberto nor Jose Rodriguez claims that the interceptions took place on his premises. Nor do they claim, or can show, that any conversation of theirs was intercepted in that apartment. Therefore, these two defendants lack standing to challenge the validity of the oral and wire intercepts at that address

---

**2.** The issue of standing was first raised as to Jose Rodriguez when the government answered his motion to suppress electronic surveillance. In his reply, he stated what is the only asserted defense position on this issue. Alberto and Jose Rodriguez are similarly situated as to the facts and circumstances in this case; and Alberto

Rodriguez has not disclaimed the argument on this issue made by counsel for Jose Rodriguez at the time oral presentations were made on behalf of all the defendants. Therefore, the court assumes that the position of these two defendants is the same on the issue of standing.

**96**

because neither of them is "an aggrieved person" within the meaning of 18 U.S.C., Section 2518(10)(a). *United States v. Jabara*, 618 F.2d 1319, 1326 (9th Cir.1980).

■■■ This is not true of the interceptions in the Lunt Avenue apartment, even though Alberto and Jose Rodriguez do not claim any proprietary or possessory interest in the premises. Their conversations were overheard in that apartment by agents of the government. A defendant whose conversations are overheard through electronic devices has standing to challenge the order that authorized the interceptions. See *United States v. Fury*, 554 F.2d 522, 526 (2d Cir.1977); *cf. In Re Flanagan*, 533 F.Supp. 957, 960 (E.D.N.Y. 1982). Therefore, Alberto Rodriguez and Jose Rodriguez have standing to challenge the validity of the Lunt Avenue interceptions, to the extent that their conversations were overheard.

■■■ Despite this fact, and contrary to their arguments, these two defendants do not have the right to attack the validity of the Buena Street interceptions on the theory that they were illegal; and that, the Lunt Avenue authorizations were tainted by what government agents heard at the Buena Street address. Only defendants who are overheard in an earlier interception are "aggrieved persons" entitled to assert that a later interception was tainted by an earlier one. *United States v. Lanese*, 385 F.Supp. 525, 527 (N.D.Ohio 1974); *United States v. Williams*, 565 F.Supp. 353, 365 (N.D.Ill.1983); *cf. United States v. Dorfman*, 690 F.2d 1217, 1228–29 (7th Cir. 1982).

2. As to the issue of compliance with 18 U.S.C. §§ 2518(1)(c) and probable cause.

Sections 2518(1) and subsection (1)(c) of the Omnibus Crime Control and Safe Streets Act require that each application for an order authorizing or approving the interception of a wire or oral communication shall include "a full and complete statement as to whether or not other inves-

tigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous...." 18 U.S.C., §§ 2518(1)(c). The purpose of these sections "is not to foreclose electronic surveillance until every other imaginable method of investigation has been successfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir.1974). Furthermore, the statute contemplates that "the showing be tested in a practical and common sense fashion." *United States v. Alfonso*, 552 F.2d 605, 611 (5th Cir.1977); S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2190.

In the face of these principles, defendants argue that the initial Buena and Lunt applications contained only inflammatory statements intimating why other procedures were not possible; and that the supporting affidavits did not fully describe what other investigative techniques had been tried and had failed. They argue that the affidavits contained only conclusionary or boilerplate allegations unsupported by factual circumstances. Thus, according to defendants, the requirements of Title III were not met.

■■■ It is true that boilerplate recitations of difficulties in gathering usable evidence for the prosecution of a criminal case are not a sufficient basis for granting a wiretap order. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.1975). But as the court of appeals for this circuit recognized in *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976), "the government's burden of establishing its compliance with [subsection 2518(1)(c)] is not great." And quoting from *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.1975), the court said:

To support a finding that normal investigative procedures are unlikely to be successful, we interpret the congressional directions as only requiring that there exist a factual predicate in the affidavit.

The affidavits in this case did not consist of boilerplate recitations; in fact, each contained the necessary factual predicate. Affiants, in apparent good faith, stated their concern about the alternative investigative procedures they considered useless by referring to the facts and circumstances each described under oath. They pointed to the conduct of FALN members, their attitudes toward each other, and the efforts they take "to prevent law enforcement authorities from gaining possession of useful physical evidence." Affiants excluded the efficacy of search warrants and pen registers; they referred to the fact that the use of grand jury investigation in cases involving the FALN, both in Chicago and New York, have been unsuccessful because witnesses refuse to testify and refuse to produce physical evidence. Each affiant stated that members of the organization willingly serve substantial contempt sentences in order to frustrate the work of grand juries. On these sworn allegations, the Chief Judge's findings that the government had complied with the requirements of 18 U.S.C. 2518(1)(c) were correct. *In Re DeMonte*, 674 F.2d 1169, 1174 (7th Cir. 1982); see *United States v. Inendino*, 463 F.Supp. 252, 260 (N.D.Ill.1978). The remaining question, as to the issue under discussion, is whether the supporting affidavits established the probable cause which the Chief Judge had to determine under the Fourth Amendment and 18 U.S.C. 2518(3)(a), (b), and (d).

Defendants contend that the authorizations and extensions for the interceptions in the Buena Street and Lunt Avenue apartments were issued without the probable cause required by the Constitution and the statute in question. They argue that probable cause is that modicum of information within an affiant's knowledge which would reasonably lead him to believe that criminal activity is afoot. They insist that the initial Buena application contained only claims of the affiant in general terms referring to slim facts that pointed more to innocent behavior on the part of Edwin Cortes and Alejandrina Torres than to indications of criminal activities.

Then turning their attention to the initial Lunt Avenue application, defendants argue that if the Buena Street surveillances were not supported by probable cause, then the Lunt apartment interceptions were even more lacking in such support. They contend that absolutely no facts existed from which government agents could have reasonably believed there was criminal activity afoot, thus warranting the intrusion of electronic surveillance at the Lunt Avenue address. They point out that prior to the application, Edwin Cortes had visited Lunt only once, and Alejandrina Torres once for only a matter of minutes. No telephone existed in the Lunt apartment; yet on the basis of such evidence, the agent who furnished the supporting affidavit concluded that probable cause existed to believe that Cortes and Torres were conspiring at that location to oppose by force the government of the United States.

In considering defendants' contentions and arguments, this court bears in mind that "[few] threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63, 87 S.Ct. 1873, 1885, 18 L.Ed.2d 1040 (1967). It must be mindful of the fact that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures." *Katz v. United States*, 389 U.S. 347, 359, 88 S.Ct. 507, 515, 19 L.Ed.2d 576 (1967).

However, the test to which the affidavits in question must be subjected is "the totality of circumstances analysis that traditionally has informed probable cause determinations." *Illinois v. Gates*, —— U.S. ——, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). "In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).

98

■ Accordingly, in determining whether the orders issued in this case were based on probable cause, this court must review the applications and affidavits and determine whether they reveal facts and circumstances within the affiant's personal knowledge, or of which he had reasonably trustworthy information, sufficient to warrant a man of reasonable caution to believe that criminal activity was afoot. *United States v. Dorfman*, 542 F.Supp. 345, 359 (N.D.Ill. 1982). Probable cause is to be gleaned from a common-sense reading of the affidavits in their entirety, informed by indices of reliability that courts have traditionally found worthy of respect. *United States v. Hyde*, 574 F.2d 856, 863 (5th Cir.1978).

■ Having reviewed the affidavits, and guided by the decided cases, this court observes that affiants and other agents began the physical surveillances of Edwin Cortes and Alejandrina Torres in December 1981 with a good deal of information gained from extensive FBI investigations of FALN criminal activities in New York City and Chicago, Illinois. From these investigative sources, they had learned of the clandestine activities and conduct of FALN members. Then after the April 4, 1980 arrest in Evanston, Illinois of 11 members of the organization, and their subsequent criminal prosecutions, Alfredo (also known as Freddie) Mendez came forward and cooperated with FBI agents; he furnished them with details about FALN modes of operation, particularly their use of "safehouses" for the purpose of storing and manufacturing explosives to be used in terrorist activities, all in furtherance of Puerto Rico independence.

More importantly, Mendez gave the agents information about Cortes and Torres, information which according to the affidavits, was checked against information which FBI agents had gained from other investigations. Thus, affiants had a background of knowledge on which to base their assertions of a reasonable belief that Edwin Cortes and Alejandrina Torres, in and about the two apartments, were engaged in conspiracies with persons unknown, to commit crimes against the United States. Therefore, this court concludes that the affidavits in this case clearly established the probable cause which the Chief Judge had to determine under 18 U.S.C. Section 2518(3)(a), (b), (d); and that the allegations met the requirements of the Fourth Amendment. *United States v. Cortese*, 568 F.Supp. 119, 126 (M.D.Pa. 1983); see *United States v. Geller*, 560 F.Supp. 1309, 1321 (E.D.Pa.1983).

3. As to the issue of defendants' compliance with the requirements of *Franks v. Delaware*.

■ It is well established that for a defendant to go behind the face of a warrant affidavit and attempt to prove it contained perjury, or reveals a reckless disregard for the truth, he must make a substantial preliminary showing that a knowingly or intentionally made false statement, or one made with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause.

To mandate an evidentiary hearing, the challenger's attack must be more than conclusionary and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth and those allegations must be accompanied by an offer of proof.

*Franks v. Delaware*, 438 U.S. 154, 155–56, 171, 98 S.Ct. 2674, 2676–2677, 2684, 57 L.Ed.2d 667 (1978).

■ *Franks* requires three elements: (1) a false statement, (2) which is made by the affiant with knowledge of the falsity, or with reckless disregard for the truth, and (3) that is material, meaning that without the false statement, the affidavit would not have been sufficient to establish probable cause. *United States v. Balistrieri*, 551 F.Supp. 275, 277 (E.D.Wis.1982). It also limits the kind of falsity which may be the subject of a challenge. While the decision requires that the warrant affidavit be "truthful,"

[t]his does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or is appropriately accepted by the affiant as true.

United States v. Dorfman, 542 F.Supp. 345, 365 (N.D.Ill.1982); and see Franks, 438 U.S. at 165, 98 S.Ct. at 2681.

■ These limits and elements from Franks v. Delaware were known by defendants and their counsel. Indeed, on the day the motions to suppress came for hearing, the government filed a memorandum in which it insisted that before defendants can be given a hearing, and be permitted to go behind the face of the affidavits in this case, they should be required to make an offer of proof and establish a substantial showing "that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included by affiant in the warrant affidavit, and that the allegedly false statement was necessary to the finding of probable cause." When counsel for defendants responded, he said it was their theory that Alfredo (Freddie) Mendez on whom the affiants had relied for certain information concerning defendants was a liar, and had lied to the affiants. Because of this fact, he said that defendants had issued a subpoena for Mendez requiring the government to produce him so that he could be interrogated in open court. When asked to make an offer of the proof that would show that any of the affiants had "knowingly or intentionally, or with reckless disregard for the truth..." included false statements in the affidavits, no counsel for any of the defendants could make such an offer. This court then ruled from the bench, and reiterates here, that defendants did not make the substantial preliminary showing required by Franks v. Delaware, one which would have entitled them to a hearing on the truth of the statements

in the affidavits. "[A]llegations that ... an informant whose story was recited by an affiant was lying, are insufficient to require a Franks hearing, since the falsity or recklessness alleged is not that of the affiant but that of the third party." United States v. McDonald, 723 F.2d 1288, 1293 (7th Cir.1983), quoting United States v. Dorfman, 542 F.Supp. 345, 366 (N.D.Ill.), aff'd., 690 F.2d 1217 (7th Cir.1982).

**4. As to the issue of video surveillance.**

This issue is important to the interests of the government in this prosecution, to the statutory and constitutional rights of the defendants, and to the public. It presents a question which, in the context of these motions to suppress, has never been decided by any federal court. The issue necessarily involves an inquiry into the right of the government to ask for, and the power of a federal court to grant, orders under which FBI agents can surreptitiously enter an apartment where identifiable persons enjoy· an expectation of privacy and there install video electronic devices that enable them, without limitation, to visually monitor and record all activities. This court approaches the resolution of the issue by examining the relevant portions of 18 U.S.C. §§ 2510–2520, commonly called Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

First, it is worth observing that "the protection of privacy was an overriding congressional concern [in enacting Title III]," Gelbard v. United States, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972), "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." Id. at 46, 92 S.Ct. at 2360. This congressional solicitude for the safeguarding of privacy was clearly expressed in the Senate Committee Report on Title III. It was there said that "Title III has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S.Rep. No. 1097, 90th

Cong.2d Sess. 66 (1968), reprinted in [1968] U.S.Code Cong. & Admin.News, pp. 2112, 2153; *United States v. Clemente,* 482 F.Supp. 102, 106 (S.D.N.Y.1979). In short, Title III represents an attempt by Congress to establish a system of electronic surveillance subject to rigorous safeguards. *United States v. Tortorello,* 480 F.2d 764, 773 (2d Cir.1973), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *cf. Jandak v. Village of Brookfield,* 520 F.Supp. 815, 819 (N.D.Ill.1981). It is consistent with these safeguards that Section 2510(4) of the Act defines "intercept" as the "aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical or other device." The term "aural" when literally translated means to come into possession through the sense of hearing. *United States v. Seidlitz,* 589 F.2d 152, 157 n. 17 (4th Cir.1978); *Smith v. Wunker,* 356 F.Supp. 44, 46 (S.D.Ohio 1972); *see United States v. New York Telephone Company,* 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977). Therefore, by its strict language, the Act refers only to devices which intercept through the sense of hearing.

This construction is not an original analysis of the statute. In fact, before this case arose, two state courts had examined Title III and in dicta pointed out that "18 U.S.C. §§ 2510–2520 and its progeny, the state wiretapping statutes, did not encompass videotaping or any means of electronic visual surveillance ...," *People v. Teicher,* 90 Misc.2d 638, 395 N.Y.S.2d 587, 591 (1977); and that "title III deals only in the aural acquisition of the contents of any wire or oral communication. As the language and legislative history of that statute makes clear, it was never intended to address the use of video surveillance equipment (citations omitted)." *People v. Teicher,* 52 N.Y.2d 638, 439 N.Y.S.2d 846, 853, 422 N.E.2d 506, 513 (1981). Commentators in at least three established legal publications expressed the same views.

For example, in Note, *Recent Development, Judicial Acceptance of Videotape As Evidence,* 16 Am.Crim.L.Rev. 183, 185 (Fall 1978), the author, speaking of Title III, states that it "governs the aural acquisition of communications, but ... does not govern the seizure of visual images." In another Note, *Electronic Visual Surveillance and the Right of Privacy: When Is Electronic Observation Reasonable?,* 35 Wash. & Lee L.Rev. 1043, 1047 n. 32 (1978), the writer explains that "[e]lectronic visual surveillance was clearly not contemplated by the draftsman of Title III."; and that "[v]ideotape surveillance, however, incorporates the added intrusion of the seizure of visual images in addition to the seizure of aural impressions, thus creating an extreme invasion where one has a justifiable expectation of privacy." *Id.* at 150. In Hodges, *Electronic Visual Surveillance and the Fourth Amendment: The New Arrival of Big Brother?* 3 Hastings Const.L.Q. 261 (1976), the author, after studying Title III, states categorically that it applies only to listening devices; it does not authorize the use of hidden cameras.

The legislative history of the statute confirms these conclusions. When the Judiciary Committee reported its consideration of the Omnibus Crime Control and Safe Streets Act of 1968, it told the Senate that "Title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials engaged in the investigation of specified types of crimes after obtaining a court order...." 1968 U.S.Code Cong. & Adm. News 2112, 2113. Thus, the Committee was recommending the enactment of a restrictive and prohibitive statute.

Then, in analyzing particular sections of its recommendations, the Committee said that "Paragraph IV defines 'intercept' to include the aural acquisition of the contents of any wire or oral communication by any electronic, mechanical, or other device. Other forms of surveillance are not within the proposed legislation." *Id.* at 2178. And courts that have spoken on the subject have said, from varying contexts, that provisions of Title III are to be strictly construed in order to carry out the purpose of the Congress and make certain that privacy of the individual is protected as so provid-

ed. *United States v. Brodson,* 528 F.2d 214, 216 (7th Cir.1975); *see United States v. Jones,* 542 F.2d 661, 671 (6th Cir.1976); *United States v. Sellaro,* 514 F.2d 114, 122–23 (8th Cir.1973); *cf. United States v. King,* 478 F.2d 494, 505 (9th Cir.1973); *Jandak v. Village of Brookfield,* 520 F.Supp. 815, 820 (N.D.Ill.1981).

However, despite existence of this catalogue of certainty concerning the meaning of Title III, and the litany of judicial pronouncements that its provisions are to be strictly construed, two assistant United States attorneys on January 18 and April 5, 1983, appeared before the Chief Judge of this court and made sworn initial applications for orders authorizing interception of wire and oral communications in Apartment 505, 736 W. Buena Street and interception of oral communications in Apartment 211, 1136 W. Lunt Avenue, and also requested authorization for FBI agents to install electronic devices so they could visually monitor and record all activities taking place within the two apartments.

Thereafter, on six occasions between February 17 and June 3, 1983, the same attorneys, and a third assistant United States attorney, applied for and obtained renewal orders, each including provisions that permitted FBI agents to engage in visual monitoring and recording of all activities, without any restriction. The authorization of the Attorney General's designate required by 18 U.S.C. § 2516(1) made no mention of visual monitoring; it only gave the United States Attorney for this district the authority to apply to a federal judge of competent jurisdiction for orders that would permit the interception of wire and oral communications. Section 2518(1) of Title III requires that "[e]ach application for an order authorizing or approving the interception of a wire or oral communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application." 18 U.S.C. §.2518(1). None of the assistant United States attorneys who made the applications stated to the Chief Judge under oath that he had authority from a designate of the Attorney General to apply for an order permitting visual monitoring. Instead, each stated that "[t]his application seeks authorization to intercept wire and oral communications of...." [3] This lack of statutory compliance appeared from the evidence admitted during the hearing of the motions to suppress. To meet some of the questions that arose, the government produced, and offered in evidence, a copy of the transcript of proceedings before the Chief Judge on Tuesday, January 18, 1983 at 4:45 p.m., the occasion of the initial Buena Street application. This document disclosed that when it was presented, the clerk called it "In the matter of the application of the United States for an order authorizing the interception of wire and oral communications." After the Assistant United States Attorney and the special agent of the Federal Bureau of Investigation had identified themselves, and after a preliminary colloquy between court and counsel, the following transpired:

**3.** After this fact was revealed during hearing of the motions to suppress, counsel for the government, who was one who had appeared before the Chief Judge, offered in evidence five letters. The earliest was dated January 19, 1983, the day after the initial Buena Street order was entered, telling the United States Attorney that pursuant to an instrument of delegation, he was being given authority "to obtain a court order authorizing the use of closed circuit television in the above investigation." The other letters, dated February 17, March 18, and April 5, 1983, were of the same tenor. The fifth, was dated January 11, 1984, while this court was hearing motions, telling counsel for the government that either

on January 17 or 18, 1983, the designated Assistant Attorney General had approved a telephonic request from the United States Attorney in this district for authority to seek a court order approving the use of closed circuit television "in the FALN investigation involving Edwin Cortes." Over defendants' objections, this court admitted the letters in evidence. However, it does not intend that either its ruling or any remark made from the Bench be construed as any finding of fact concerning these letters or the reaching of any conclusion of law as to their legal sufficiency to meet the requirements of 18 U.S.C. §§ 2516(1) and 2518(1).

THE COURT: The statute involved says nothing about "visual" interception. I understand that a camera is involved here or something of that nature?

MR. REIDY: That is correct, Judge.

THE COURT: Any precedent on that, at all?

MR. REIDY: Yes, the case law, that I have reviewed with respect to that matter—the statute is also silent, for example, with respect to the make of surreptitious entry [sic], the Courts have held that, in the conduct of one of these Title 3's [sic], that the Court has the authority in order to effectuate that—an order under the All Writs Act—to order that. And, also, there is case law supporting the use of visual cameras, in the same context. So there is case law, although the statute is silent on it.

After a further colloquy during which the Chief Judge expressed satisfaction with the showing of probable cause, the order applied for was issued. The "case law" to which allusion had been made by the Assistant United States Attorney was not cited or disclosed; but in this proceeding, its extent has been revealed. It consists of a memorandum opinion of United States District Judge Robert Ernest Keeton of the District of Massachusetts in *Application of Order Auth. Interception, etc.,* 513 F.Supp. 421 (D.Mass.1980). And because of the importance the government attaches to this citation, the court will give it careful attention.

Apparently, the occasion reported was an application by the United States "for an order authorizing interception of oral communications in accordance with Title III ..., and for simultaneous videotape surveillance." 513 F.Supp. at 422. The application sought authorization for surreptitious entry into a private dwelling and the implantation of monitoring devices "within the dwelling, subject to the limitations of the proposed authorization." 513 F.Supp. at 422. The nature of the government's request led Judge Keeton to observe that "[t]he proposed surveillance is extraordi-narily intrusive." 513 F.Supp. at 422. But he found that the supporting affidavits established probable cause to believe that violations of federal narcotic laws were ongoing in the subject dwelling; and that certain prerequisites of Title III had been met by the government. However, Judge Keeton recognized that "[t]hese circumstances present an issue unresolved in statutes and precedents, as to whether the court may properly authorize video surveillance as well as oral interceptions." 513 F.Supp. at 422. He pointed out that while Title III provided "in stated circumstances for 'interceptions' of 'oral communication,' 18 U.S.C. § 2518, makes no explicit reference to video surveillance." 513 F.Supp. at 422.

Judge Keeton then stated the government's arguments: they were that the Fourth Amendment to the United States Constitution, Rule 41, Fed.R.Crim.P., and the court's inherent authority under the All Writs Act, 28 U.S.C. § 1651, were statutory and constitutional bases for an order authorizing video surveillance. "In substance, if not explicitly," Judge Keeton said, "the government [was contending] that it need not comply with the strict conditions that Title III imposes in relation to applications for a court order authorizing oral interception." 513 F.Supp. at 422. He did not answer the government's argument or contention.

Instead, Judge Keeton observed that given the statute and its legislative history, the views that might be urged upon a court to which an application for video surveillance is made, fall into three categories: (1) the absence of any provisions in Title III regarding video surveillance implies that no strictures like those of Title III are to be imposed, and the court may authorize video surveillance as long as it is not forbidden by the Fourth Amendment, the Rules of Criminal Procedure, and precedents; (2) the absence of provisions in Title III for video surveillance implies that video surveillance is forbidden; (3) the absence of any provisions in Title III regarding video surveillance un-

answered by Title III, with the consequence that courts must of necessity fashion answers to all such questions in light of whatever guidance is available in the constitution, in laws, and in judicial decisions.

He rejected the first and second of these views, saying that they "give little if any weight to the concern that Congress manifested, in enacting Title III, that investigative methods be chosen with due regard both for investigating effectively and for safeguarding individual rights." 513 F.Supp. 422. Judge Keeton said that "[w]hen Congress had not directly addressed and answered a question, courts—including lower courts, until the Supreme Court has spoken—in answering, by necessity should nevertheless be guided by the aims, principles and policies that manifestly underlie enacted statutes." (citations omitted).

After reaching this conclusion, Judge Keeton explained that when the government made its application, it had been disclosed that the authorization from the Attorney General's designate, in compliance with Title III, "referred only to 'interception' of 'oral communications' even though the application sought an order for video surveillance as well." 513 F.Supp. 423. He insisted that the government attorney procure from the Attorney General's designate express authorization for the application that sought an order permitting agents of the government to engage in videotape surveillance. The authorization was procured.

Then Judge Keeton took into account that in the application made before him, the government proposed an order in which its agents would be

> directed that the video surveillance component be turned on *after* it has been determined from the audio component that communications involving illegal activities or illegal activity itself, within the scope of the proposed investigation, is taking place and that the video component remain on only as long as and under the same constraints as are imposed on

oral interception for the purpose of minimizing the intrusion consistently with the requirements of Title III.

With these restrictions, he ruled that "[i]n these distinctive circumstances and with these special provisions for minimizing intrusion, the application will be allowed and the proposed order will be entered." 513 F.Supp. at 423.

It is important to notice that this ruling was not made in an adversary proceeding; it was *ex parte*, a term that anciently has been said to imply an examination in the presence of one of the parties and the absence of the other. *Lincoln v. Cook*, 2 Scam. (Ill.) 62. Judge Keeton did not have before him a proceeding like the motions to suppress now before this court. For this reason, the memorandum in *Application of Order Auth. Interception, etc.* cannot be said to constitute "case law," as the Assistant United States Attorney told the Chief Judge, because that term ordinarily means the body of jurisprudence formed by adjudged cases, instances in which two parties present a controversy to a judge for decision. Moreover, Judge Keeton did not hold, nor did he intend to decide, that under Title III he had authority to approve videotape surveillance by government agents.

But even if the memorandum in *Application of Order Auth. Interception, etc.* were considered to be "case law," it is obvious that the matter before Judge Keeton, and the way it was handled by counsel for the government, differed greatly from what took place, not once but on eight occasions, before the Chief Judge of this court. At the outset of the application, it was disclosed to Judge Keeton, that the Attorney General's designate had not authorized any application under Title III for video surveillance. It has been held "that primary or derivative evidence secured by wire interceptions pursuant to a court order issued in response to an application which was, in fact, not authorized by one of the statutorily designated officials must be suppressed ... upon a motion properly made ...." *United States v. Giordano*, 416 U.S. 505, 508, 94 S.Ct. 1820, 1823, 40

L.Ed.2d 341 (1974); *see* Annot. 64 A.L.R. Fed. 115. Thus, Judge Keeton was given the opportunity, at least to his satisfaction, to remedy this statutory defect by ordering that proper authorization for the application be obtained from a designate of the Attorney General.

More importantly, the order that the government proposed to Judge Keeton contained specific provisions for minimizing the intrusion that video surveillance represents. This was to be accomplished by agents of the government not using the video component until the audio component had disclosed criminal activity within the dwelling in question. After Judge Keeton became satisfied that these restrictions made the government's proposal consistent with the requirements of Title III, he granted the application and issued the order.

Nothing of the kind happened in the case at bar. The lack of statutory authorization was not corrected because this fact was not disclosed to the Chief Judge of this court; and the proposed orders did not contain restrictions which, assuming this was legally possible, may have made the applications and orders consistent with Title III. As a consequence, the orders under attack in these motions to suppress had all the force of general warrants, "a general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). For these reasons, this court must reject the government's argument that *Application of Order Auth. Interception, etc.*, 513 F.Supp. 421 (D.Mass.1980), is authority for the proposition that video surveillance can be authorized by a federal judge on the application of the government under Title III of the Omnibus Crime Control and Safe Streets Act of 1968.

The court also rejects the government's argument, the one it made before Judge Keeton and asserts here, that the Fourth Amendment, Rule 41, Fed.R.Crim.P., and the inherent power of federal courts under the All Writs Act, are statutory and constitutional bases for the orders authorizing visual monitoring in the two apartments. First, the Fourth Amendment provides that warrants to search shall not issue but upon probable cause "supported by Oath or affirmation ... particularly describing the place to be searched, or the persons or things to be seized." An order for video surveillance requires scrutiny under the guidance of this amendment, *Kinoy v. Mitchell*, 331 F.Supp. 379, 382 (S.D.N.Y. 1971); but the orders under attack in this case, in those parts that authorized visual monitoring, did not particularly describe what was to be seized through the capture of visual images.

As to Rule 41, at least one commentator on the law has observed that it "appears to have been intended to cover only tangible property"; not intangibles such as intercepted oral communications and visual images. See Note, *Electronic Visual Surveillance, etc.*, 65 Wash. & Lee L.Rev. 1043, 1054 n. 85 (1978). Assuming, however, that the rule covers intangible property, there are in this court's judgment, insurmountable difficulties in the government's argument. Rule 41(c) requires that the warrant "shall command the officer [to whom it is delivered] to search, within a specified period of time not to exceed 10 days, the person or place named for the property specified. The warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." Subparagraph (d) of the rule, which governs execution and return with inventory, requires that "[t]he officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken." It is clear that nothing done by agents of the government, when they executed the orders in question, conformed to the requirements of Rule 41.

Finally, as to the All Writs Act, its "provision does not enlarge or expand the juris-

diction of the courts but merely confers ancillary jurisdiction where jurisdiction is otherwise granted and already lodged in the court." *United States v. First Federal Savings & Loan Ass'n,* 248 F.2d 804, 808 (7th Cir.1957); the statute presupposes existing complete jurisdiction "and does not contain a new grant of judicial power." *Hyde Construction Company v. Koehring Company,* 348 F.2d 643, 648 (10th Cir. 1965). The government's argument on this point consists of that common fallacy in logic: begging the question, because it assumes that Title III gives a federal judge the authority to issue an order for visual surveillance when it does not.

■ Therefore, this court concludes that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, does not authorize a federal judge to enter orders permitting agents of the government to visually monitor and through video electronic equipment record all activities taking place in apartments in which defendants, or some of them, enjoyed an expectation of privacy. The evidence obtained by the government through the video surveillance was "unlawfully intercepted"; it does not accord with any authorization under Title III, it is not protected by any law enacted by Congress; and it was acquired in violation of defendants' constitutional rights. The Supreme Court has said that "[t]he words 'unlawfully intercepted' are themselves not limited to constitutional violations, and we think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

### III

Accordingly, defendants' motions to suppress are granted with respect to the visual monitoring in Apartment 505, 736 West Buena Street and Apartment 211, 1135 West Lunt Avenue, Chicago, Illinois from January 18 to June 29, 1983. However, their motions are denied with respect to the audio tapes used in those locations. The portions of the surveillance orders that authorized interceptions of wire and oral communications are severable from the paragraph in each that purported to authorize visual monitoring. *United States v. Cox,* 462 F.2d 1293, 130 (8th Cir.1972); *United States v. Cook,* 657 F.2d 730, 735 (5th Cir. 1981); *cf. United States v. Riggs,* 690 F.2d 298, 300 (1st Cir.1982); *United States v. Suquet,* 547 F.Supp. 1034 (N.D.Ill.1982); and see 2 W. LaFave, *Search and Seizures: a Treatise on the 4th Amendment,* 4.6(f) at 111–12.

So ordered. .